# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF SOUTH CAROLINA
# CHARLESTON DIVISION

| | |
|---|---|
| Gary Nestler, Viewed Student Female 200, Viewed Student Male 300, on behalf of themselves and all others similarly situated, | ) )  ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| The Bishop of Charleston, a Corporation Sole, Bishop England High School, Tortfeasors 1-10, The Bishop of the Diocese of Charleston, in his official capacity, and Robert Guglielmone, individually, | ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

Civil Action No. 2:21-613-RMG

**ORDER AND OPINION**

Before the Court is Defendants The Bishop of Charleston, a Corporation Sole (the "Diocese"), Bishop England High School, Tortfeasors 1-10, The Bishop Diocese of Charleston, in his official capacity, and Robert Guglielmone (collectively "Defendants")'s motion for a protective order regarding the testimony of Maria Aselage. (Dkt. No. 42). Also before the Court is non-party witness Maria Aselage's motion for order of protection and to quash subpoena (Dkt. No. 43). For the reasons set forth below, the Court denies both motions.

**Facts**

Plaintiffs bring this putative class action alleging that, for roughly two decades, students at Bishop England High School ("BEHS") were made to disrobe in locker rooms which contained "large glass window[s]" whereby BEHS employees, agents, and/or others may have viewed students.

1

On May 1, 2019, BEHS employee Jeffrey Scofield was arrested after BEHS reported to law enforcement that he took videos and made photographs of male students changing clothes in one of the school's locker rooms.

Plaintiff filed this suit on February 3, 2021. The next day, Defendants issued a press release regarding the lawsuit that identified Maria Aselage as Director of Media Relations for the Diocese and provided her contact information. (Dkt. No. 42 at 2); (Dkt. No. 45-3).

Plaintiffs deposed Aselage. During her deposition, Aselage testified that, as of February 2021, her company, Hearsay Communications, performed "contract work[]" for the Diocese and that Aselage served as the Diocese's "director o[f] media relations." (Dkt. No. 45-4 at 2-3) (noting the Diocese is a "long-term client" for which Aselage performs "project" and "retainer" based work); *see also* (Dkt. No. 43 at 2) (stating Aselage's responsibilities include "preparing and issuing press releases and responding to media inquiries"). Aselage testified that, in drafting the above press release, she consulted with, *inter alia*, the Diocese's General Counsel. (Dkt. No. 45-4 at 7). Aselage testified that she generally had no personal knowledge of or involvement with the matters discussed in the press release or in Plaintiff's lawsuit. (*Id.* at 7-8) ("Q: Do you have any personal knowledge about whether or not the allegations [in Plaintiffs' complaint] are correct or not correct? A: I do not have any personal knowledge."); *see also* (*Id.* at 9) (stating Aselage had "personal knowledge" that Defendants terminated Scofield only to the extent that she "was sent [a copy of] the termination later from Mr. Finneran"). During Aselage's deposition, Aselage's personal attorney instructed her not to answer questions regarding conversations Aselage had with the Diocese's General Counsel. (*Id.* at 4).

On October 13, 2021, Defendants moved for a protective order requesting that the Court find Aselage is not required to testify or provide documents or other discovery regarding her discussions with the Diocese's General Counsel. (Dkt. No. 42). Plaintiffs oppose. (Dkt. No. 45).

On October 14, 2021, Aselage moved for a protective order seeking substantially the same relief as Defendants. (Dkt. No. 43).

Defendants and Aselage's motions are fully briefed and ripe for disposition.

### Legal Standard/Analysis

In diversity cases, the application of the attorney-client privilege is governed by state law—in this case, the law of South Carolina. Fed. R. Evid. 501; *Hottle v. Beech Aircraft Corp.*, 47 F.3d 106, 107 n.5 (4th Cir. 1995). "The attorney-client privilege protects against disclosure of confidential communications by a client to his attorney." *State v. Owens*, 424 S.E.2d 473, 476 (S.C. 1992). "[T]he burden of establishing the [attorney-client] privilege rests upon the party asserting it." *Wilson v. Preston*, 662 S.E.2d 580, 585 (S.C. 2008). The privilege consists of the following essential elements: (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived. *ContraVest Inc. v. Mt. Hawley Ins. Co.*, 273 F. Supp. 3d 607, 613 (D.S.C. 2017) (citing *Tobaccoville USA, Inc. v. McMaster*, 387 S.C. 287, 692 S.E.2d 526, 529–30 (2010)). And "although the presence of a third-party would normally destroy the attorney-client privilege, several exceptions do exist." *Tinian Sys., LLC v. Core Campus Columbia I, LLC*, No. 3:15-CV-1102-JFA, 2016 WL 11643760, at *2 (D.S.C. Aug. 19, 2016). Here, citing *In re Bieter Co.*, 16 F.3d 929 (8th Cir. 1994), Defendants argue that the "functional equivalent exception" applies to the Diocese's relationship with Aselage.

3

In *Bieter,* the court found that an independent contractor was hired by the plaintiff Bieter and, among other things, worked as a representative of, and advisor to, the plaintiff regarding certain business dealings. *Id.* at 933. Bieter sought protection over materials that contained communications between its attorneys and the independent contractor, an individual who had worked closely with Bieter both in its attempt to develop a parcel of land and in subsequent litigation. *Id.* at 931. The independent contractor and Bieter entered into an agreement, which provided for the consultant to work out of Bieter's office and to be paid a monthly fee and expenses. *Id.* The agreement was to run for one year. *Id.* The independent contractor worked with architects, consultants, and counsel, and appeared at public hearings on behalf of Bieter and was viewed and dealt with as a representative of Bieter. *Id.* at 934. The court concluded that "[t]here is no principled basis to distinguish [the independent contractor's] role from that of an employee, and his *involvement in the subject of the litigation* makes him precisely the sort of person with whom a lawyer would wish to confer confidentially *in order to understand Bieter's reasons for seeking representation*. As we understand the record, he was in all relevant respects the functional equivalent of an employee." *Id.* at 938 (internal citations omitted) (emphasis added). The court then addressed the factors to consider when addressing whether the attorney-client privilege is applicable to an employee's communications and concluded that the communications between the consultant and Bieter's counsel were protected. *Id.* at 940.

Thus, *Bieter* enounced a two-prong assessment in applying the functional equivalent test. The first prong requires the Court to decide if the third-party's relationship to the client is the sort that justifies the application of the privilege. If so, the Court proceeds to step two and applies a five-part test (the "*Diversified* test") to the communications at issue. Under the *Diversified* test,

> the attorney-client privilege is applicable to an employee's communication if (1) the communication was made for the purpose of securing legal advice; (2) the

employee making the communication did so at the direction of his corporate superior; (3) the superior made the request so that the corporation could secure legal advice; (4) the subject matter of the communication is within the scope of the employee's corporate duties; and (5) the communication is not disseminated beyond those persons who, because of the corporate structure, need to know its contents.

*Id.* at 936.

The Court finds that no attorney-client relationship exists between the Diocese and Aselage. To the extent South Carolina law recognizes the "functional equivalent" test, Defendants and Aselage have failed to meet prong one of *Bieter*—namely, that Aselage's "relationship to the client is the sort that justifies the application of the privilege." *See Tinian Sys., LLC*, 2016 WL 11643760, at *2 (applying *Bieter*). The facts here are a far cry from those of *Bieter*. The Diocese employs Aselage on a contract basis as "director o[f] media relations." Unlike the contractor in *Beiter*, however, Aselage has absolutely no knowledge, much less involvement, in the facts underlying this case. *E.g.*, (Dkt. No. 45-4 at 30:17-19 and 32:1-5) ("Q: Once again, you have no personal knowledge as to whether [the information in the press release] is correct or not, you just know what you've been told? A: That's what I was told, correct."). *Compare In re Beiter*, 16 F.3d at 933-34 (noting the contractor worked out of Bieter's office and interacted daily with the principals of the partnership to attempt to develop Bieter's parcel of land—the "*sine qua non* of [Bieter's] existence"); *Id.* at 934 (noting the contractor appeared at public hearings on behalf of Bieter and was viewed "by and dealt with by [various officials] as a representative of Bieter"); *Id.* at 938 ("As Bieter's sole representative at meetings with potential tenants and with local officials, he likely possesses information that is *possessed by no other*.") (emphasis added) *with* (Dkt. No. 43 at 3) ("As part of her preparation of the written communications . . . Ms. Aselage discussed her efforts [to draft press releases] with the Diocesan General Counsel and did not issue any documents without her express permission."); (Dkt. No. 45-4 at 51:13-22) (testifying that Aselage works

"under the supervision of the general counsel" and is "retained" by the Diocese). Under *Bieter*, Aselage is not the "functional equivalent" of an employee of Defendants. *See AVX Corp. v. Horry Land Co.*, No. 4:07-CV-3299-TLW-TER, 2010 WL 4884903, at *5, 7 (D.S.C. Nov. 24, 2010) (declining to find, after considering declarations and documents submitted for *in camera* review, that outside consultant was the functional equivalent of an employee and noting that "courts must narrowly construe the [attorney-client] privilege and recognize it 'only to the very limited extent that ... excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth'") (citing *Trammel v. United States,* 445 U.S. 40, 50, 100 S. Ct. 906, 63 L. Ed. 2d 186 (1980)); *In re Valeant Pharms. Int'l, Inc. Sec. Litig.*, No. 315 CV 07658MASLHG, 2021 WL 3140050, at *14 (D.N.J. July 22, 2021) (finding waiver where consultant's services "consisted of general public relations assistance, the primary purpose of which was to present a favorable public image of Valeant, not to assist its attorneys in litigation"); *Calvin Klein Trademark Trust v. Wachner*, 198 F.R.D. 53, 55 (S.D.N.Y. 2000) (holding that disclosure of otherwise privileged communications to a public relations firm providing "ordinary public relations advice" constituted a waiver).  Defendants and Aselage's conclusory arguments that Aselage is the functional equivalent of an employee of the Diocese, in the *Bieter* sense, are simply unavailing.[1]

Accordingly, the Court finds no attorney-client relationship exists between the Diocese and Aselage and that Aselage's communications with the Diocese's General Counsel are not entitled to protection from discovery.

---

[1] In fact, both Defendants and Aselage avoid discussing the first prong of *Bieter* in their respective motions and focus only on the *Diversified* factors. (Dkt. No. 42 at 5) (arguing that Defendants meet the *Diversified* standard); (Dkt. No. 43 at 7) (same).  Even if the Court reached the *Diversified* test, Defendants and Aselage's motions likely fail as neither entity has shown, *inter alia*, that Aselage spoke with the General Counsel to secure legal advice.

6

Last, Defendants and Aselage argue that all oral and written communications between the Diocese's General Counsel and Aselage are entitled to protection from disclosure as "attorney work product." Aselage argues verbatim:

> Ms. Aselage prepared documents under the auspices of the General Counsel during and in relation to the discovery of Mr. Scofield's illegal activities and this eventual litigation. While operating under the direction of the General Counsel, such product is not discoverable.

(Dkt. No. 43 at 6). For their part, Defendants state:

> The General Counsel's thoughts, mental impressions, advice regarding strategy, and input on public statements on behalf of the Diocese constitute both ordinary and opinion work product that is privileged. The Diocese clearly had the right to assert the protections afforded to its General Counsel's work product. As such, Ms. Aselage should not be compelled to testify regarding her communications with the Diocesan General Counsel either the Diocese's response and strategy for addressing the Jeffrey Scofield incident or this litigation.

(Dkt. No. 42 at 4). Neither Defendants nor Aselage provided the Court a single document for *in camera* review in support of the contention the Diocese's General Counsel shared attorney-work product with Aselage as opposed to—for example—information intended for dissemination via the press release noted *supra*.

Federal law governs the work product doctrine. The work-product doctrine protects an attorney's work done in anticipation of litigation. *Solis v. Food Employers Labor Relations Ass'n*, 644 F.3d 221, 231 (4th Cir. 2011). The doctrine is based on the principle that "[n]ot even the most liberal of discovery theories can justify unwarranted inquiries into the files and the mental impressions of an attorney." *Hickman v. Taylor*, 329 U.S. 495, 510, 67 S. Ct. 385, 91 L. Ed. 451 (1947). Work product can be fact work product or opinion work product. *In re Allen*, 106 F.3d 582, 607 (4th Cir. 1997). Fact work product consists of materials prepared by an attorney that do not contain the fruit of his mental processes, while opinion work product contains an attorney's

mental impressions, conclusions, opinions, or legal theories. *In re Grand Jury Proceedings # 5*, 401 F.3d 247, 250 (4th Cir. 2005). Fact work product is entitled to qualified immunity and "is discoverable upon a showing of both a substantial need and an inability to secure the substantial equivalent of the materials by alternate means without undue hardship." *Allen*, 106 F.3d at 607 (internal quotation marks omitted). Opinion work product, however, "can be discovered only in very rare and extraordinary circumstances." *Id.* The party invoking the protection of the work-product doctrine bears the burden of demonstrating its applicability. *Solis*, 644 F.3d at 232.

       The Court rejects Defendants' arguments that Aselage's communications or emails with the Diocese's General Counsel are entitled to protection as attorney work product. Defendants and Aselage have failed to meet their burden of showing the Diocese's General Counsel shared *any* work-product with Aselage. As noted above, Defendants and Aselage argue this point in a conclusory fashion, having failed to submit documents to this effect for the Court's *in camera* review. *See Wachner*, 198 F.R.D. at 55 ("[I]t is obvious that as a general matter public relations advice, even if it bears on anticipated litigation, falls outside the ambit of protection of the so-called 'work product' doctrine embodied in Rule 26(b)(3), Fed. R. Civ. P. That is because the purpose of the rule is to provide a zone of privacy for strategizing about the conduct of litigation itself, not for strategizing about the effects of the litigation on the client's customers, the media, or on the public generally."); *In re New York Renu with Moistureloc Product Liability Litigation,* No. MDL 1785, CA 2:06–MN–77777–DCN, 2008 WL 2338552 at *11 (D.S.C. May 8, 2008) (holding that the majority of a public relations firm's documents were not protected by the attorney-client privilege, reasoning that "there is no indication that [the public relations firm] is providing anything other than ordinary public relations advice" and holding that the party "has not satisfied its burden of showing that [the public relations firm] is necessary to the legal representation.").

Further, to the extent Defendants and Aselage argue the Diocese's General Counsel orally shared opinion work product with Aselage with the intent that such information be maintained in confidence, the Court rejects the contention as unsupported by the record before it. Aselage's testimony does not indicate any involvement in the substance of this lawsuit. To the contrary, the record establishes, at most, that the Diocese's General Counsel shared information with Aselage for the express purpose that Aselage draft the press release at issue. *See LifeVantage Corp. v. Domingo*, No. 2:13-CV-01037-DB-PMW, 2015 WL 5714426, at *2 (D. Utah Sept. 29, 2015) ("Courts have widely rejected claims of attorney-client privilege or work-product protection over communications with public relations firms. 'A party may not cloak a document with a privilege by simply having business ... or public relations matters handled by attorneys.'") (string citing cases to this effect).

      Accordingly, the Court denies Defendants and Aselage's motions in full. Plaintiff may re-depose Aselage concerning the questions posed that the witness was instructed not to answer. Further, and consistent with this Order, Aselage must comply with Plaintiffs' October 13, 2021 document request to Aselage and Hearsay Communications. (Dkt. No. 43-2).

**Conclusion**

For the reasons stated above, the Court **DENIES** Defendants' motion for protective order regarding the testimony of Maria Aselage (Dkt. No. 42). The Court also **DENIES** Aselage's motion for order of protection and to quash subpoena. (Dkt. No. 43). The Court further **ORDERS** Plaintiffs and Defendants to, by November 12, 2021, meet and confer, schedule, reconvene and complete the deposition of Aselage in accordance with this Order. By this date, Aselage shall also respond to Plaintiff's October 13, 2021 document request to Aselage and Hearsay Communications.

**AND IT SO ORDERED**.

s/ Richard Mark Gergel
Richard Mark Gergel
United States District Judge

November 3, 2021
Charleston, South Carolina