**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| Gary Nestler, Viewed Student Female 200, Viewed Student Male 300, on behalf of themselves and all others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 2:21-613-RMG |
| v. | ) ) ) | **ORDER AND OPINION** |
| The Bishop of Charleston, a Corporation Sole, Bishop England High School, Tortfeasors 1-10, The Bishop of the Diocese of Charleston, in his official capacity, and Robert Guglielmone, individually, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

Before the Court is Plaintiffs' motion for class certification (Dkt. No. 67). For the reasons set forth below, the Court denies Plaintiffs' motion.

**Facts**

Plaintiffs bring this putative class action alleging that, from roughly 1989 through 2019, students at Bishop England High School ("BEHS") were made to disrobe in locker rooms which contained coaches' offices with "large glass window[s]" whereby BEHS employees, agents, and/or others may have viewed students.

Per the Amended Complaint, around May 1, 2019, Defendants learned that BEHS employee Jeffrey Alan Scofield had "surreptitiously filmed students while they used a BEHS locker room, through the window viewing the locker room, and had stored the recordings on an electronic device believed to be a computer belonging to BEHS." Defendants reported Scofield to law enforcement authorities. The City of Charleston Police Department arrested Scofield on

charges of voyeurism. Scofield subsequently pled guilty to the charges in the Berkely County Court of General Sessions. *See* (Dkt. No. 35). Plaintiffs initiated this action.

Plaintiffs propose two putative classes—a "Tuition Class" and a "Viewed Class."

The *Tuition Class*[] consists of all those persons, or such persons' personal representatives, heirs or assigns, wherever located, who have or in the future may have any claim against Defendants The Bishop of Charleston, a Corporation Sole, Bishop England High School, Tortfeasors 1-10, The Bishop of the Diocese of Charleston, in his official capacity, and Robert Guglielmone, individually, arising out of, based upon, or in any way related to, or involving claims for reimbursement of tuition paid to Defendants as a result of Jeffrey Scofield or any other Bishop England High School employee or agent monitoring, watching, viewing, spying, prying, besetting, photographing or videotaping them, or other such similar type conduct, through the viewing windows of the coaches' office into the locker rooms while attending Bishop England High School from 1998 through 2019.

The *Viewed Class*[] consists of all those persons, or such persons' personal representatives, heirs or assigns, wherever located, who have or in the future may have any claim against Defendants The Bishop of Charleston, a Corporation Sole, Bishop England High School, Tortfeasors 1-10, The Bishop of the Diocese of Charleston, in his official capacity, and Robert Guglielmone, individually, arising out of, based upon, or in any way related to, or involving injuries or damages claimed as a result of Jeffrey Scofield or any other Bishop England High School employee or agent monitoring, watching, viewing, spying, prying, besetting, photographing or videotaping them, or other such similar type conduct, through the viewing windows of the coaches' or other BEHS officials' offices into the locker rooms while attending Bishop England High School from 1998 at least through 2019.

(Dkt. No. 67 at 34-35).

As to the Tuition Class, Plaintiffs bring claims for: (1) Negligence, (2) Unjust Enrichment, (3) Breach of Warranty, and (4) Negligent Hiring, Supervision and Retention. As to the Viewed Class, Plaintiffs bring claims for: (1) Wrongful Intrusion into Private Affairs, (2) Negligence, and (3) Negligent Hiring, Supervision and Retention. (Dkt. No. 35 at 16-27).

On December 13, 2021, Plaintiffs moved for class certification. (Dkt. No. 67). Defendants oppose. (Dkt. No. 75). Plaintiffs filed a reply. (Dkt. No. 78).[1] Defendants filed a surreply. (Dkt. No. 83).

Plaintiffs' motion is fully briefed and ripe for disposition.

### Legal Standard

Rule 23(a) of the Federal Rules of Civil Procedure identifies the prerequisites for a class action as follows:

> (a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a); *see generally Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 568 U.S. 455, 133 S.Ct. 1184, 1191, 185 L.Ed.2d 308 (2013); *Gray v. Hearst Commc'ns, Inc.*, 444 Fed. Appx. 698, 700 (4th Cir. 2011); *Brown v. Nucor Corp.*, 576 F.3d 149, 152 (4th Cir. 2009); *Thorn v. Jefferson–Pilot Life Ins. Co.*, 445 F.3d 311, 339 (4th Cir. 2006). These four prerequisites for class certification under Rule 23(a) are commonly referred to as numerosity, commonality, typicality, and adequacy of representation.

In addition to the requirements of Rule 23(a), Plaintiffs must also meet the requirements for maintenance of a class action imposed by Rule 23(b)(3)—namely, that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently

---

[1] In their reply, "Plaintiffs concede, and withdraw their Motion for Class Certification as to the cause of action for Negligent Hiring." (Dkt. No. 78 at 15).

adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Factors pertinent to a determination whether the "predominance" and "superiority" requirements have been satisfied include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

*Id.*

"Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011). Certification is only proper if the Court, after conducting a "rigorous analysis," is satisfied that the prerequisites of Rule 23 have been satisfied. *See id.* at 350–51, 131 S.Ct. 2541. "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped." *Id.* at 351, 131 S.Ct. 2541. However, "'Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage,'" and "the merits of a claim may be considered only when 'relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.'" *Brown v. Nucor Corp.*, 785 F.3d 895, 903 (4th Cir. 2015) (quoting *Amgen Inc*, 568 U.S. at 466). "Plaintiffs bear the burden of demonstrating satisfaction of the Rule 23 requirements and the district court is required to make findings on whether the plaintiffs carried their burden." *Thorn v. Jefferson–Pilot Life Ins. Co.*, 445 F.3d 311, 317 (4th Cir. 2006) (quoting *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 370 (4th Cir. 2004)) (internal quotation marks and modifications omitted).

In addition to the two-step framework expressly laid out in Rule 23, the Fourth Circuit has "repeatedly recognized that Rule 23 contains an implicit threshold requirement that the members of a proposed class be 'readily identifiable.'" *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014) (quoting *Hammond v. Powell*, 462 F.2d 1053, 1055 (4th Cir. 1972)). Other circuits have described this rule as an "ascertainability" requirement. *Id.* "However phrased, the requirement is the same. A class cannot be certified unless a court can readily identify the class members in reference to objective criteria." *Id.*

In *EQT Production Co.*, the Fourth Circuit vacated the class certification decision of the district court and remanded the case for reconsideration of the ascertainability issues, concluding that the district court had previously "failed to rigorously analyze whether the administrative burden of identifying class members ... would render class proceedings too onerous." 764 F.3d at 358. The Fourth Circuit explained "[a] class cannot be certified unless a court can readily identify the class members in reference to objective criteria." *Id.* (citing *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012); *Crosby v. Soc. Sec. Admin. of U.S.*, 796 F.2d 576, 579–80 (1st Cir. 1986)). Specifically, although "plaintiffs need not be able to identify every class member at the time of certification[,] ... '[i]f class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." *Id.* (quoting *Marcus*, 687 F.3d at 593). *EQT Production Co.* has come to stand for the proposition that the goal of the "readily identifiable" requirement is "to define a class in such a way as to ensure that there will be some 'administratively feasible [way] for the court to determine whether a particular individual is a member' at some point." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 658 (4th Cir. 2019) (quoting *EQT Prod. Co.*, 764 F.3d at 358). Moreover, courts have further expounded that a "plaintiff cannot merely identify a mass of data which could aid the process of identifying

class members[,] ... the Plaintiff must also provide an efficient method of using this information." *Spotswood v. Hertz Corp.*, No. RDB-16-1200, 2019 WL 498822, at *6 (D. Md. Feb. 7, 2019).

## Rule 23's Requirements as Considered in this Action

### 1. Ascertainability

#### a. Fail-Safe Classes

A fail-safe class is one that "is defined so that whether a person qualifies as a member [of the class] depends on whether the person has a valid claim." *Bigelow v. Syneos Health, LLC*, No. 5:20-CV-28-D, 2020 WL 5078770, at *4 (E.D.N.C. Aug. 27, 2020) (citing *EQT Production Co.*, 764 F.3d at 360 n.9); *Messner v. Northshore Univ. HealthSys.*, 669 F.3d 802, 825 (7th Cir. 2012). Fail-safe classes are considered improper for two reasons. First, in a fail-safe class, "a class member either wins or, by virtue of losing, is defined out of the class and is therefore not bound by the judgment." *Messner*, 669 F.3d at 825. Hence, fail-safe classes "fail to provide the resolution of the claims of all class members that is envisioned in class action litigation." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 538 (6th Cir. 2012). Second, fail-safe classes do not comply with Rule 23. Specifically, Rule 23 requires—as noted above—that members of a proposed class be ascertainable. *Krakauer*, 925 F.3d at 655. In certifying a class, however, a court may not "conduct a preliminary inquiry into the merits of a suit." *Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 177 (1974). But "class litigation should not move forward when a court cannot identify class members without 'extensive and individualized fact-finding or mini-trials.'" *Krakauer*, 925 F.3d at 658. (quoting *EQT Prod. Co.*, 764 F.3d at 358). Because a fail-safe class requires a court to inquire into the merits of the underlying case to identify the members of the class, fail-safe class definitions violate these principles. *See, e.g., Chado v. Nat'l Auto Inspections, LLC*, No. JKB-17-2945, 2019 WL 1981042, at *4, (D. Md. May 3, 2019).

6

### b. South Carolina Tort for Wrongful Intrusion into Private Affairs

The cause of action for wrongful intrusion into private affairs consists of (1) an intentional (2) intrusion, (3) which is substantial and unreasonable, (4) into that which is private. *Snakenberg v. Hartford Cas.*, 299 S.C. 164, 171-72 (Ct. App. 1989). Damages "consist[] of the unwanted exposure resulting from intrusion." *Id.* at 172. Where "a plaintiff bases an action for invasion of privacy on 'intrusion,' bringing forth no evidence of public disclosure, it is incumbent upon him to show a blatant and shocking disregard of his rights, and serious mental or physical injury or humiliation to himself resulting therefrom." *O'Shea v. Lesser*, 308 S.C. 10, 17-18 (1992) (citing *Rycroft v. Gaddy*, 281 S.C. 119 (Ct. App. 1984)).

### c. Plaintiffs' Proposed Classes Are Not Ascertainable

Defendants argue that Plaintiffs' proposed classes are not ascertainable. Defendants argue that Plaintiffs' proposed classes are impermissible "fail-safe" classes or otherwise "too vague, too broad, or too subjective" to satisfy the ascertainability requirement. (Dkt. No. 75 at 13-14). Namely, Defendants argue that Plaintiffs' proposed classes cannot be defined with objective criteria as only those individuals who were viewed or who paid tuition for children who were viewed would be part of the classes. *See* (*id.* at 13).

Plaintiffs argue the proposed classes are ascertainable because they are "objectively defined as all students that attended Bishop England [from 1998 through 2019]." (Dkt. No. 78 at 6-7). To support this conclusion, Plaintiffs argue that the tort of wrongful intrusion into private affairs does not require proof of actual viewing. (Dkt. No. 67 at 25 & n.4) (string citing various cases from outside of South Carolina to this effect)[2]; *e.g.*, *Friedman v. Martinez*, 242 N.J. 449

---

[2] As to the Viewed Class, Plaintiffs do not discuss their negligence claim in either their opening memorandum or reply. *See* (Dkt. No. 67 at 2) (noting only that Plaintiffs bring negligence claims); (Dkt. No. 78). Presumably, because a class member would not be able to establish a negligence

(2020) (holding that, under New Jersey law, and pursuant to Restatement (Second) of Torts § 652B, "a victim does not have to present evidence that she was secretly recorded to bring a cause of action for intrusion onto seclusion" as "[t]he harm occurs when the electronic invasion of privacy takes place"); *Koeppel v. Speirs*, 808 N.W.2d 177, 182 (Iowa 2011) (noting that courts "across the nation are divided on the question whether a person can intrude without actually viewing or recording the victim"); *Id.* (finding that under Iowa law the tort does not require proof of actual viewing, adopting the reasoning set forth in *Hamberger v. Eastman*, 106 N.H. 107 (1964) and further reasoning that "Restatement (Second) of Torts [§ 652B illus. 3, at 379] make[s] no suggestion that the intrusion into solitude or seclusion requires someone to actually see or hear the private information"). "Applying this law to the facts of the case," Plaintiffs argue, "it is indisputable that . . . all students that attended [BEHS] from 1998 through 2019," are necessarily class members, thus rendering the proposed classes objectively definable. (Dkt. No. 78 at 7).

The Court finds that Plaintiffs' proposed classes are not ascertainable. Plaintiffs misstate the law in South Carolina as to the tort of intrusion into private affairs. Plaintiffs ignore that South Carolina is not a Restatement district for this tort, *Snakenberg*, 299 S.C. at 170-71; Eli A. Meltz,

---

claim without proof that she was in fact harmed—i.e., viewed—the analysis described herein applies equally to the Viewed Class's negligence claim. Further, the same analysis would apply to the claims of the Tuition Class, all of which turn on a child being "viewed." *See, e.g.*, (Dkt. No. 35 ¶ 115) (Defendants negligent because they "directed, allowed, and/or encouraged adult athletic officials or others, including all their agents, employees, and/or servants, to observe, watch, monitor, spy, or otherwise view the VIEWED CLASS members in the subject locker rooms (male and female)"); (*Id.* ¶ 81) (Defendants negligent toward Tuition Class "by designing, constructing, and maintaining the BEHS locker rooms and athletic offices in a way that adult athletic officials or their other agents, employees, and/or servants and others would have unfettered, open, and intrusive view of the student s while they engaged in private activities such as dressing, undressing, being nude, disrobing, showering and drying, and an opportunity for actors and perpetrators to derive sexual pleasure from such observation and recorded material"); (*Id.* ¶¶ 86-87) (Defendants liable for unjust enrichment as to Tuition Class because "Defendants failed to take adequate steps to prevent students from being viewed"); (*Id.* ¶¶ 94-95, 97) (same regarding warranty claim of Tuition Class—"Defendants granted access to BEHS to Scofiled including . . . viewing rooms").

8

No Harm, No Foul? "Attempted" Invasion of Privacy and the Tort of Intrusion Upon Seclusion, 83 Fordham L. Rev. 3431, 3450 (2015), and that, to the contrary, South Carolina law explicitly requires that information about the victim be acquired by the defendant for the tort to be actionable. *Compare Snakenberg*, 299 at 171 ("[T]he damage consists of the unwanted *exposure resulting* from the intrusion.") (emphasis added); *Id.* (noting that "[a]n intrusion may consist of *watching, spying, prying, besetting, overhearing*, or other similar conduct"—implicitly requiring a defendant actually view the plaintiff) (emphasis added); *Meltz*, 83 Fordham L. Rev. at 3450 ("South Carolina's formulation of the cause of action indicates that, unlike section 652B, information must be acquired about the plaintiff to be actionable: the damage is from the unwanted exposure arising from the intrusion and *not from the intrusive act itself*, as the Restatement indicates.") (emphasis added); *O'Shea*, 308 S.C. at 17-18 (implicitly acknowledging information must be obtained about the plaintiff because, where "a plaintiff bases an action for invasion of privacy on 'intrusion,' *bringing forth no evidence of public disclosure* [of the information], it is incumbent upon him to show a blatant and shocking disregard of his rights, and serious mental or physical injury or humiliation to himself resulting therefrom") (emphasis added) *with Koeppel*, 808 N.W.2d at 182, 184 (holding that under Iowa law an intrusion can occur without actually viewing or recording the victim). Given the above, Plaintiffs' proposed classes will not be defined "until the case is resolved on the merits," *Bigelow*, 2020 WL 5078770, at * 5, because only if a putative class member can show that he, she, or her child was viewed in the locker rooms will that individual be known to be part of one of the putative classes, *Melton ex rel. Dutton v. Carolina Power & Light Co.*, 283 F.R.D. 280, 288 (D.S.C. 2012) (noting that fail-safe classes "require[] a court to rule on the merits of the claim at the class certification stage in order to tell who was included in the class" and that "[s]uch a class definition is improper because a class member either wins or, by virtue of losing,

9

is defined out of the class and is therefore not bound by the judgment.") (citing *Messner*, 669 F.3d at 826).[3]   Accordingly, the proposed classes are unascertainable and cannot be certified.   *See Krakauer*, 925 F.3d at 658.

### 2. Standing

Assuming for argument's sake that Plaintiffs' proposed classes were ascertainable, the Court considers whether Plaintiffs' named representatives have constitutional standing.

The Supreme Court has made clear that "named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" *Doe v. Obama*, 631 F.3d 157, 160 (4th Cir. 2011) (citing *Simon v. E. Ky. Welfare Rights Org.,* 426 U.S. 26, 40 n. 20, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)).   Without a sufficient allegation of harm to the named plaintiff in particular, plaintiffs cannot meet their burden of establishing standing. *Id.*;

---

[3] In *Bigelow*, the proposed class was "Any and all employees who worked for Defendant during the relevant limitations period who were denied promotions, pay increases, and/or suffered any adverse employment action, as a result of her/his/their prior or anticipated use of protected FMLA leave during her/his/their employment."   The Court found:

> This class definition turns on whether the employee has a valid claim, and "[t]hat is a classic fail-safe class." To illustrate, if plaintiff fails to prove (1) that a particular employee experienced adverse promotion, pay, or employment actions or (2) that Syneos took such actions because the employee used or planned to use FMLA leave, then Syneos is entitled to a judgment in its favor with respect to that employee. The court, however, could not enter a judgment against that particular employee because that employee would no longer fit the class definition. Bigelow's fail-safe class defines itself based on legal conclusions and impermissibly constitutes "a class that cannot be defined until the case is resolved on its merits." A fail-safe class action leaves a defendant in a "heads, I win ... tails, I can sue again" situation, contravening the truism that class actions should "resolve an issue that is central to the validity of each one of the claims in one stroke."

*Bigelow v. Syneos Health, LLC*, No. 5:20-CV-28-D, 2020 WL 5078770, at *5 (E.D.N.C. Aug. 27, 2020) (internal citations omitted).

*see also TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2210 (2021) (no standing for 6,332 class members whose credit reporting files contained inaccurate information but were not disseminated to third parties—"[t]he mere presence of an inaccuracy in an internal credit file, if it is not disclosed to third parties, causes no concrete harm"); *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (noting that, "[t]o have standing, a plaintiff must show "injury in fact," causation, and redressability); *Id.* ("Injury in fact" is an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'").

Defendants argue that neither Viewed Student Female 200, Viewed Male Student 300, nor Nestler are adequate class representative because all lack standing to prosecute this lawsuit.  (Dkt. No. 75 at 2, 15) ("Because there is not a shred of evidence that either student-plaintiff was actually illicitly recorded changing clothes—neither is among the five boys identified by the South Carolina Attorney General's Internet Crimes Against Children Task Force as having been surreptitiously recorded changing clothes in the locker room by Jeffrey Scofield in 2019—Plaintiff's claims are entirely 'what might have happened' or 'what could have happened' as opposed to what did happen.").  Plaintiffs, by contrast, argue that all elements of the tort of intrusion into private affairs are satisfied and further argue that Defendants have "admitted to the blanket monitoring of their students in the locker room. The school also conceded . . . in Principal Finneran's testimony, that the monitoring of the students when they were unaware would constitute an invasion of privacy and is thus . . . not a safe, moral or nurturing environment." (Dkt. No. 78 at 2); (Dkt. No. 67 at 4-5, 6) (stating that Defendants have "admitted to installing the viewing windows for monitoring the students for 'safety reasons' without the use of video cameras") (citing the testimony of Roger Attansio, one of the architects of BEHS who testified, in response to Plaintiff's question that

windows in the locker rooms act as "peepholes" "I don't know that I would say it's like a peephole. I guess one could make that argument, yes sir"); (*Id.* at 9) (arguing Defendants have "admitted to actually using" the windows because Maria Aselage, a spokesperson for the Diocese, released a press statement indicating the windows "were included in the plans and installed in the building in the 1990's for safety reasons").

Here, both Viewed Student Female 200 and Viewed Male Student 300 testified that, to their knowledge, they were not viewed by anyone through the windows in the locker rooms of BEHS. *See, e.g*, Viewed Male Student 300 Deposition, (Dkt. No. 75-5 at 10:13-15) ("Q: Did anybody ever take a picture in the locker room? A: No."); (*Id.* at 10:25-11:2) ("Q: Did you ever see the blinds open? A: No."); (*Id.* at 11:22-24) ("Q: So you didn't see [people in the coaches' office when] looking into the office from the locker room? A: No."); (*Id.* at 15:10-14) (testifying that "no one has informed" deponent that he was "photographed by any person, not just Scofield" while changing clothes in the locker room); (Dkt. No. 67-18 at 32:3-6) ("Q: So you're suing because of something that might have happened, but you don't know whether it did or not? A: [Yes,] I think that's worse than knowing."); Viewed Student Female 200 Deposition, (Dkt. No. 75-6 at 9:5-19) (testifying deponent saw blinds on the windows, that the blinds were "closed" and that she could not remember if she "ever s[aw] the blinds open"); (*Id.* at 12:4-9) ("Q: And you never observed anybody looking through the window while you were changing clothes, correct? A: No. Q: You did not see anybody? A: No."); (*Id.* at 16:10-12) ("Q: Has anyone alerted you that somebody had taken pictures of you? A: As of this moment, no."). Defendants further point out that Plaintiff's expert psychologist testified as follows regarding the harm allegedly suffered by the named viewed plaintiffs:

> It's kind of an idea of if I'm driving across a bridge and the bridge collapses, but I made it across the bridge, but the car behind me almost didn't, and the car behind

it didn't, I might go on and be okay until I learned, wow, do you realize just how close that was on that day to ending my life. And it's a moment when you take a pause.

Amanda Salas, MD Deposition, (Dkt. No. 75-2 at 82:11-18). As to Gary Nestler, the named plaintiff for the Tuition Class, Nestler testified that his daughter was bullied at BEHS, (Dkt. No. 75-8 at 53:14-17), that Nestler was harmed because he felt his daughter did not receive a "safe" education due to the windows in the locker rooms at BEHS, (*Id.* at 53:7-13), but that Nestler did not know if his daughter had ever been photographed or videoed, (*Id.* at 55:3-23).

In their motion for class certification, Plaintiffs cite *Snakenberg v. Hartford Cas Ins. Co.*, 299 S.C. 164 (Ct. App. 1989) and assert it stands for the proposition that "[a]ll Plaintiffs need to prove in this case is the four elements of the invasion of privacy tort, and then, 'the fact of damage is established as a matter of law.'" (Dkt. No. 67 at 24). Plaintiffs continue that, because "their privacy was invaded by the use of the viewing portals," and because "it is <u>not</u> necessary for the Class Representatives to 'prove' that they were actually viewed or monitored," the class representatives are adequate and class certification appropriate. (*Id.* at 24-25 & n.4) (string citing cases such as *Koeppel* and *Friedman* which do not require that a victim show she was viewed to state a claim).

The Court finds that Plaintiffs' class representatives lack Article III standing and are inadequate class representatives. As noted above, *Snakenberg* does require that an individual show she was viewed to bring an intrusion of privacy claim. And, as also detailed *supra*, neither Viewed Student Female 200 nor Viewed Male Student 300 testified to having been viewed by anyone and are thus not even members of Plaintiffs' proposed classes. Nor did Nestler testify that his daughter had been viewed. As such, none of these individuals suffered an "intrusion" under *Snakenberg*,

299 S.C. at 171, or an otherwise concrete harm which would confer Article III standing. *See TransUnion*, 141 S. Ct. at 2200 ("No concrete harm, no standing.").

Because the Court finds there are fatal flaws in Plaintiffs' class definitions and that Plaintiffs' named representatives lack standing, Plaintiffs' motion for class certification should be denied. Nevertheless, because deficient class definitions can be modified—though Plaintiffs do not seek leave to amend should the Court deny their motion—the Court will continue with its class certification analysis, focusing on predominance and superiority.

### 3. Rule 23(b)(3)

#### a. Plaintiffs Fail to Demonstrate Predominance

Rule 23(b)(3) was added as part of the 1966 rule amendments. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997). It was "designed to secure judgments binding all class members save those who affirmatively elected to be excluded" in situations where certification is "convenient and desirable." *Id.* at 614–15 (citing advisory committee's note to 1946 amendment). The rule provides that if the requirements of Rule 23(a) are satisfied, the action may be maintained as a class action when "the questions of law or fact common to class members predominate over any questions affecting only individual members, and ... a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Thus, the two requirements—predominance and superiority.

The two requirements serve two purposes. "The predominance requirement 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Thorn*, 445 F.3d at 319 (citing *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 362 (4th Cir. 2004)); *see also Amchem*, 521 U.S. at 615 (noting the Advisory Committee sought to cover cases that would achieve "uniformity of decisions as to persons similarly situated, without sacrificing procedural

14

fairness or bringing about other undesirable results"). "The superiority requirement ensures that 'a class action is superior to other available methods for the fair and efficient adjudication of the controversy.'" *Thorn*, 445 F.3d at 319 (citing Fed. R. Civ. P. 23(b)(3)). And Rule 23 itself sets forth several factors the court should consider in deciding whether the putative class action meets the two requirements: (1) "the class members' interests in individually controlling the prosecution or defense of separate actions;" (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members;" (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum;" and (4) "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A)–(D).

The "predominance requirement is 'far more demanding' than Rule 23(a)'s commonality requirement." *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 459 (4th Cir. 2013) (Niemeyer, Jr. concurring in part and dissenting in part) (citing *Amchem*, 521 U.S. at 623). The United States Supreme Court has stated that "[c]onsidering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). The Fourth Circuit has similarly noted that "[t]he application of Rule 23 often turns on the cause of action." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 655 (4th Cir. 2019).

If "[a] cause of action [ ] includes a fact-bound element or a claim-specific affirmative defense [, it] may be less susceptible to class treatment than one that does not." *Id.* The focus of the predominance analysis being "common proof," with the "availability of such proof turn[ing] on what exactly needs to be proven." *Id.*; *see also Case v. French Quarter III, LLC*, No. 2:12-cv-2518, 2015 WL 12851717, at *6 (D.S.C. July 27, 2015) ("In mass tort cases, common issues of law and fact have been held to predominate 'where the same evidence would *resolve* the question

of liability for all class members.") (emphasis added); *Farrar & Farrar Dairy, Inc. v. Miller-St. Nazianz, Inc.*, 254 F.R.D. 68, 72 (E.D.N.C. 2008) ("[A] court must ensure that class certification in a mass tort case really does foster [justice and judicial efficiency]."). Where a plaintiff "must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims, the common issues do not predominate." *Case*, 2015 WL 12851717, at *6 (internal quotation omitted).

Relying on their erroneous interpretation of *Snakenberg*, Plaintiffs argue that predominance is met here because "the issue of unwanted . . . exposure is common to all students that attended [BEHS] from 1998 to 2019. All students used the locker rooms, and all had their privacy invaded," leaving the "only question to be resolved . . . the amount of damages to be assessed by the trier of fact." (Dkt. No. 67 at 32).

The Court concludes that questions of individual proof and damages will predominate over common issues of the litigation. *See Case*, 2015 WL 12851717, at *6. As noted above, to state plausible causes of action, especially as to invasion of privacy, factual questions would need to be resolved for each individual class member.  These include whether a class member or a class member's child was in-fact viewed and the unique "shame, humiliation, and emotional distress suffered by the [class member]" in order to calculate damages. *Snakenberg*, 299 S.C. at 171-72; *see* (Dkt. No. 75 at 24) ("The privacy claims alone would require massive individualized evidence regarding whether any child over the last 20 years actually had his or her privacy invaded unjustifiably. Whether any student suffered any injury at any time will completely depend on individualized evidence. Likewise, as Dr. Salas admitted, the extent of any impact on any former student will be entirely individualized."); *see also* (*id.* at 23) (noting, as to the proposed parent class, that Nestler claims he was promised his daughter would be "educated in a safe, nurturing

16

environment" but that Plaintiffs have "presented no evidence that the parents of every aspirant to attend Bishop England received or relied on any such statements, or that either the warranty claim . . . or unjust enrichment claim can be determined for the entire class with common proof"); (Dkt. No. 67 at 26) (citing to screenshots of BEHS's website for the proposition that BEHS held itself out to the Tuition Class "as a moral, caring and safe environment to send one's child or children" and that it would "seriously curb the possibility of sexual abuse happening in our parishes"); (Dkt. No. 78 at 8) (arguing that is not necessary to "make individual inquires for a class-wide determination that the representation was relied on", citing to *Moyle v. Liberty Mut. Ret. Ben. Plan*, 823 F.3d 948, 964 (9th Cir. 2016), *as amended on denial of reh'g and reh'g en banc* (Aug. 18, 2016) for the proposition "[w]here the defendant's representations were allegedly made on a uniform and classwide basis, individual issue of reliance do not preclude class certification," but citing no testimony or evidence *here* as to classwide or uniform representations); (Dkt. No. 67-21 at 48:10-16) (testifying three employees of BEHS told Nestler the school was "safe").  Stated simply, Plaintiffs cannot establish predominance as individual issues will predominate over common issues of the litigation. *See Kline v. Security Guards, Inc.*, 196 F.R.D. 261, 268, 272 (E.D. Pa. 2000) (denying plaintiffs' motion for class certification for lack of, inter alia, ascertainability and predominance because the pertinent tort—violation of the Wiretap Act—required individualized determinations as to each class members reasonable expectation of privacy and "[t]hese factors are likely to be markedly different for members of the putative class. For instance, a class member who had a conversation while other people were nearby, such as during the start of the work shift, would not have nearly the objective expectation of privacy as would a member who was alone in the entranceway and quietly conducting union business on the telephone. The multitude of individual inquiries simply to determine class membership is inapposite to the

expected efficiencies of a class action"); (*Id.*) ("Plaintiffs in this case maintain that Defendants engaged in a common course of conduct [the installation of cameras and a microphone near an employee entrance and payphone] to violate the Wiretap Act. They assert that the alleged constant audio surveillance is a common question to all, as are questions relating to their claims of conspiracy and negligent supervision. However, the complaint is based upon allegations of individual violations, each of which turns on individual circumstances. Without an objectively reasonable expectation of privacy, conversations made by a particular class member will not be protected oral communications under the Act.").

### b. Plaintiffs Fail to Demonstrate Superiority

Superiority requires that use of a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Superiority "'depends greatly on the circumstances surrounding each case,'" and "'[t]he rule requires the court to find that the objectives of the class-action procedure really will be achieved in the particular case.'" *Stillmock v. Weis Markets, Inc.*, 385 Fed. Appx. 267, 274 (4th Cir. 2010). When making this determination, the Court should "not contemplate the possibility that no action at all might be superior to a class action.'" *Thomas v. FTS USA, LLC*, 312 F.R.D. 407, 425 (E.D. Va. 2016) (quoting *Brown v. Cameron–Brown Co.*, 92 F.R.D. 32, 49 (E.D. Va. 1981)). Factors the court should consider include: "(A) the class members' interest in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing the class action." Fed. R. Civ. P. 23 (b) (3) (A)-(D). Ultimately, "[t]he goal is to

ensure that class certification occurs only when economy and efficiency are reasonably likely to result." *Ganesh, L.L.C. v. Comput. Learning Ctrs.*, Inc., 183 F.R.D. 487, 491 (E.D. Va. 1998).

Here, Plaintiffs do not address superiority. *See* (Dkt. No. 67 at 33-34) (discussing predominance and arguing that "Plaintiffs must satisfy [only] one of the Rule 23(b) factors"). *Contra, e.g., Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 424 (4th Cir. 2003) ("To be sure, Rule 23(b)(3) class actions must meet predominance and superiority requirements not imposed on other kinds of class actions."); *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 319 (4th Cir. 2006) ("Rule 23(b)(3) has two components: predominance and superiority.").

The Court finds that the superiority requirement is not met. As Defendants correctly argue, to the extent individuals believe they were filmed or photographed, such individuals may bring individual lawsuit to vindicate those rights. *See Castano v. Am. Tobacco Co.*, 84 F.3d 734, 748 (5th Cir. 1996) (no superiority where individual damage claims are high). Further, as discussed above, because Plaintiffs' claims turn on individual questions as to each class member, the difficulties in managing this case as a class action would be great. *See* (Dkt. No. 75 at 26) (noting the Court would have to "conduct numerous trials within a trial: were you a student? is your claim time-barred? were you viewed illicitly and without reason? did you suffer mental harm as a result?"); *O'Shea v. Lesser*, 308 S.C. 10, 17-18 (1992) (Where "a plaintiff bases an action for invasion of privacy on 'intrusion,' bringing forth no evidence of public disclosure, it is incumbent upon him to show a blatant and shocking disregard of his rights, and serious mental or physical injury or humiliation to himself resulting therefrom."); § 4:64. Overview, 2 Newberg on Class Actions § 4:64 (5th ed.) (superiority often met in two situations, either where "many individuals have small damage claims" and where, absent a class suit, "it is unlikely that any of the claims will be accorded relief" or where the legal system is "flooded by particular types of claims"); *Amchem*

19

*Products, Inc.*, 521 U.S. at 617 ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor.") (citation omitted); *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 860, 119 S. Ct. 2295, 144 L. Ed. 2d 715, 43 Fed. R. Serv. 3d 691 (1999) ("One great advantage of class action treatment of mass tort cases is the opportunity to save the enormous transaction costs of piecemeal litigation.").

## Conclusion

For the reasons stated above, the Court **DENIES** Plaintiffs' motion for class certification (Dkt. No. 67).

**AND IT SO ORDERED**.


<u>s/ Richard Mark Gergel</u>
Richard Mark Gergel
United States District Judge


March 24, 2022
Charleston, South Carolina